## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

McLANE FOOD SERVICE, INC.,

       **Plaintiff,**

                                     **Civil Action 2:10-cv-840**

     **v.**                            **Magistrate Judge E.A. Preston Deavers**

GANESH PONNERI RAO, *et al.*,

       **Defendants.**


## MEMORANDUM OF DECISION AND ORDER

Plaintiff, McClane Food Service, Inc. ("McLane"), brings this action against Ganesh Ponneri Rao ("Mr. Rao"), alleging that he transferred shares of stock in violation of Ohio's Uniform Fraudulent Transfer Act, Ohio Revised Code 1336.01 *et seq.* ("Ohio's UFTA"). Plaintiff also brings this action against Saanil Hospitality, Inc. ("Saanil"), Rao's Hospitality, Inc. ("Rao"), and Pooja Hospitality, Inc. ("Pooja"), the transferees of Mr. Rao's shares of stocks. Finally, Plaintiff names Gita Rao ("Mrs. Rao") as a Defendant, asserting that she is also a transferee because she became the sole shareholder of Pooja, Saanil, and Rao after Mr. Rao forfeited his shares back to the respective corporations. At the request of McLane, after Mr. Rao and Rao filed for bankruptcy protection, the Court dropped these Defendants as parties to this action pursuant to Federal Rule of Civil Procedure 21. (ECF Nos. 32 and 61.) This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332. This matter came before the Court for a bench trial in January 2012. The Court, via this Memorandum of Decision, issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons set forth below, the Court

concludes that McLane has demonstrated that Mr. Rao's forfeiture of his shares in Saanil, Rao, and Pooja constituted a fraudulent transfer withing the meaning of Ohio's UFTA.

## I.  BACKGROUND

According to McLane, *after* Mr. Rao incurred a debt to Mclane in June 2008 and at a time when he was insolvent, he forfeited his shares of stock in Saanil, Rao, and Pooja without receiving anything of value.  McLane submits that the forfeitures are fraudulent under Ohio Revised Code § 1336.05(A).  McLane seeks a judgment against Defendants for the value of the shares of stock at the time of the transfers.  McLane posits that Mrs. Rao is jointly and severally liable for the value of the shares of stock as a "de facto transferee" because she became the sole shareholder of Saanil, Rao, and Pooja after Mr. Rao forfeited his shares.  McLane also seeks to recover its attorneys' fees incurred in pursuing this action.

Defendants contend that no fraudulent transfer occurred because Mr. Rao transferred his shares to Mrs. Rao in September 2007, *before* he incurred his obligation to McLane in June 2008.  Defendants explain that under Ohio's UFTA, a transfer is made upon perfection of a security interest and property encumbered by a valid lien, such as a perfected security interest, is not an "asset" as that term is defined under Ohio's UFTA.  Defendants maintain that on September 1, 2007, Mrs. Rao acquired a valid security interest in the shares of stock at issue.  Defendants further maintain that on that same day, she perfected her security interest against all subsequent creditors and lien holders because, consistent with the requirements set forth in Ohio Revised Code §§ 1308.17 and 1309.203, Mrs. Rao gave value, did not have notice of any adverse claim, and obtained control of the shares.  Defendants identify the value Mrs. Rao gave as the security of Mr. Rao's pre-existing debt to her.  Defendants assert that the pre-existing debt consisted of a $550,000 loan that

Mrs. Rao provided to Mr. Rao in November 2005 so that he could purchase twenty-six Kentucky Fried Chicken ("KFC") restaurants. Defendants further assert that the loan is evidenced by the Cognovit Promissory Note, which Mr. Rao executed on December 29, 2005.

McLane counters that Mrs. Rao never loaned her husband any money, and thus, Mrs. Rao did not give any value to Mr. Rao. McLane, therefore, maintains that the shares of stock at issue were not transferred to Mrs. Rao pursuant to a valid security agreement, but instead Mr. Rao forfeited the shares back to the companies without receiving anything of value.

At trial, the parties stipulated that as of January 18, 2012, Mr. Rao owed McLane $528,957.88 and that no money has been paid on that judgment. The parties also stipulated to the authenticity of their trial exhibits.

## II. FINDINGS OF FACT

Based upon the trial testimony and the documentary evidence, the Court makes the following findings of fact pursuant to Federal Rule of Civil Procedure 52(a).

1. Mr. Rao is the husband of Mrs. Rao. Between 2003 and 2006, Mr. and Mrs. Rao acquired shares of Saanil, Rao, and Pooja stock.

2. Pooja was formed in 2002, with Mrs. Rao owning fifty-five shares of stock and Mr. Rao owning forty-five shares. Pooja owns and operates a hotel in Urbana, Ohio. Pooja purchased the hotel for $1.3 million, with the entire purchase price financed through a loan from Commercial Savings Bank in the amount of the purchase price. Mrs. Rao served as the Vice-President of Pooja until 2008, when she became its President. Pooja's Shares Certificate states that its shares are "transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed." (Pl.'s Trial Ex. P-P.)

Pooja's Code of Regulations states that "No issue or transfer of stock shall be made except on the books of the corporation, under signature of the President [or] the Secretary, and of the holder of record stock, or his agent or attorney, thereunto duly constituted, and no transfer of stock shall be made except upon the production and delivery to the corporation of the certificate of the holder." (Pl.'s Trial Ex. P-Q at Art. IV § 2.)

3. Saanil was formed in June 2004, with Mrs. Rao owning eighty-one shares of stock and Mr. Rao owning nineteen. Saanil owns and operates a KFC/Long John Silvers restaurant in Toledo, Ohio. Mrs. Rao invested $54,000, and Sovereign Bank financed the operations with a loan for $1,500,000. Mrs. Rao was the Director of Saanil. After opening the restaurant in 2007, Saanil made no further additions or improvements. Saanil's Shares Certificate states that its shares are "transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed." (Pl.'s Trial Ex. P-J.) Saanil's Bylaws state that "[e]very such transfer [of shares of stock] shall be entered on the transfer books of the Corporation." (Pl.'s Trial Ex. P-M at § 5.03.)

4. Rao was formed in September 2006, with Mrs. Rao owning eighty-one shares of stock and Mr. Rao owning nineteen. In September 2006, Rao acquired four KFC restaurants in Pennsylvania. In February 2007, Rao acquired ten additional restaurants in Akron. The purchase price for the fourteen restaurants was $6.5 million. Sovereign Bank financed the entire purchase price. In addition, the seller of the KFC franchises financed $500,000. Mr. and Mrs. Rao borrowed $185,000 from Mrs. Rao's brother for the downpayment. Rao's Shares Certificate states that its shares are "transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed." (Pl.'s Trial Exs. P-

D and P-E.)  Rao's Bylaws state that "[e]very such transfer [of shares of stock] shall be entered on the transfer books of the Corporation."  (Pl.'s Trial Ex. P-G at § 5.03.)

5.  Mr. Rao owned G&H Restaurant Specialties, LLC ("G&H").  He also served as G&H's President.  G&H owned and operated twenty-six KFC franchised restaurants.  At trial, Mrs. Rao testified that Mr. Rao sought her assistance to invest in a venture to purchase the twenty-six KFC restaurants.  She stated that she finally agreed to loan him the money.  Mrs. Rao testified that she "got the loan using Pooja's assets, using [her] shares of the majority shareholder" and also leveraged her personal home as collateral.  (Tr. at 103–04.)  Mr. Rao testified that the money came "Pooja Hospitality, and Pooja Hospitality is giving it to G&H to buy the restaurants."  (Tr. at 42.)  On November 11, 2005, The Commercial Savings Bank generated a document entitled "Universal Note and Security Agreement," reflecting that Pooja was refinancing its loan for the purpose of "cash[ing] out to buy 26 KFC restaurants."  (Pl.'s Trial Ex. P-U.)  G&H, Pooja, and Mr. Rao were listed as borrowers; Mrs. Rao was not.  She was not personally obligated to make payments on the loan.  Mrs. Rao initialed the first two pages of the note, but did not sign it.  Rather, Mr. Rao signed the note in his individual capacity, making him personally liable, and for Pooja, in his capacity as President.  The collateral for the loan included four properties: Pooja's Urbana, Ohio, hotel; Mr. and Mrs. Rao's home; an investment property owned by Mr. and Mrs. Rao; and an investment property owned solely by Mr. Rao.  The total loan amount was $1.8 million, with cash to the borrowers, G&H and Mr. Rao, in the amount of $516,196.79.  (Pl.'s Trial Exs. P-U and P-X.)  The Final Settlement Statement generated from the purchase of the twenty-six KFC restaurants demonstrates that G&H brought $516,196.79 to the closing and that Mr. Rao brought $50,000 as a downpayment for the loan.  (Defs.' Trial Ex. D-B.)  Mrs. Rao testified that she "gave" the $50,000 to Mr. Rao

from her personal funds.  (Tr. at 105.)

6.  At trial, Defendants offered a copy of a "Cognovit Promissory Note," dated December 29, 2005.  (Defs.' Trial Ex. D-A.)  Mrs. Rao testified that this Cognovit Note evidenced the loan that she personally provided to Mr. Rao and G&H to finance the purchase of the twenty-six KFCs. The Cognovit Note provided that Mr. Rao was to make an initial payment of $100,000 on or before June 30, 2007 and pay the remaining balance with interest on or before June 30, 2008.

7.  Mrs. Rao first testified that Mr. Rao was personally obligated to pay Pooja's loan from Commercial Savings Bank and also that he was personally obligated to pay her $550,000.  She then conceded, however, that this "doesn't mean that he pays [her] $550,000 and pays the bank $1.8." (Tr. at 133–34.)  She explained that she had Mr. Rao provide the Cognovit Note to her to be sure that he repaid Pooja's loan.

8.  Mrs. Rao testified that Mr. Rao did not pay her $100,000 on June 30, 2007, as the Cognovit Note required.  She testified that she agreed to give Mr. Rao an extension of time to pay in exchange for entering into a security agreement.

9.  Defendants offered a copy of a "Security Agreement," dated September 1, 2007, and executed by Mr. and Mrs. Rao.  (Defs.' Trial Ex. D-C.)  The Security Agreement purports to grant Mrs. Rao a security interest in Mr. Rao's shares of stock in Saanil, Rao, and Pooja and indicates that the purpose of the Security Agreement is "[t]o secure payment of indebtedness as evidence[d] in a Promissory Note executed on December 29, 2005 . . . ."  (*Id*.)  The Security Agreement indicates that Mr. Rao "acknowledges that he has placed the executed Collateral (certificates) with the secured party . . . ."  (*Id*.)

10.  Mrs. Rao testified that consistent with the Security Agreement, on September 1, 2007,

Mr. Rao signed the back of the stock certificates that he pledged as security and delivered them to her. In support of Mrs. Rao's testimony, Defendants offered copies of Mr. Rao's stock certificates for Saanil, Rao, and Pooja, demonstrating that he transferred the stock certificates into her possession on September 2, 2007. (Pl.'s Trial Exs. P-D, P-J, and P-P.)

11. In December 2006, Mr. Rao and G&H entered into an agreement with McLane for McLane to supply and deliver food and other products to G&H. In connection with this agreement, Mr. Rao signed a personal guaranty. Thereafter, McLane supplied approximately $600,000 worth of goods per month to G&H. G&H breached its agreement with McLane when, on July 1, 2008, it failed to pay for the products McLane supplied during the period of June 12, 2008, through July 1, 2008. In addition, G&H owed McLane $50,000 from an obligation incurred in May 2008. Mr. Rao likewise breached the personal guaranty in failing to make the payments to McLane on behalf of G&H. G&H liquidated its assets, with insufficient assets to satisfy its obligation to McLane. Mr. Rao also did not have sufficient funds to pay McLane on his personal guaranty. The Director for Human Resources for Rao and Saanil testified at trial that in May 2008 "everyone was aware that G&H was done and that . . . the sale wasn't enough to cover everything." (Paul, P., Tr. at 83–83.)

12. On July 16, 2008, McLane filed an action against G&H and Mr. Rao, seeking to recover the monies owed pursuant to the agreement and personal guaranty. On August 6, 2009, McLane obtained a judgment against G&H and Mr. Rao in the amount of $358,418.66, inclusive of interest as of March 17, 2009, plus interest accruing thereafter at the rate of $156.74 per diem, plus attorneys' fees of $8000. As of January 18, 2012, the trial date, Mr. Rao owed McLane $528,957.88.

13. Mr. Rao's August 2008 Personal Financial Statement, submitted to McLane in October

2008 under penalty of perjury, reflects that he had a negative net worth of approximately $1 million. (Pl.'s Trial Exs. P-B and P-C.) The Court finds that Mr. Rao's net worth was overstated such that his negative net worth was even greater for two reasons. First, as Mr. Rao testified, the statement did not reflect the refinance loan to Pooja, for which he was personally liable. Consistent with his testimony, the financial statement indicates that Pooja's approximate assets were $488,013, and its liabilities were only $1.3 million even though after the refinance, Pooja was encumbered with a $1.8 million loan. Thus, as of August 2008, Mr. Rao's shares in Pooja had no monetary value and his net worth was at least negative $1.5 million. Second, the total value of his shares in Pooja, Rao's and Saanil is overstated because Mr. Rao listed and added up the total value of the companies' assets rather than including only the value of his shares. The statement lists Pooja's value as $488,013 and notes that he is the 45% owner. He also lists the value of Rao's assets as $185,250, noting he is a 19% owner and the value of Saanil's assets as $54,000, noting he is a 19% owner. Mrs. Rao testified that the money out of pocket to purchase Rao's KFCs was $185,000, with the remainder being financed. She opined that the value of Rao's shares of stock in 2008 was negative, explaining that she purchased the KFCs for $6.5 million, took a loan out for $7.1 million, and put only $185,000 of her own money as startup capital. Rao subsequently filed bankruptcy. Mrs. Rao testified that the total cost of Saanil's KFC/Long John Silvers restaurant was $1.5 million. She further testified that to finance the restaurant, she took out a $1.5 million loan and brought $50,000 of her own money for start-up capital. Thus, Mr. Rao estimated the "value" of Saanil and Rao to be the amount of money put down as an initial investment. Accordingly, the Court finds that as of August 2008, Mr. Rao's shares of stock in Rao were valued at $35,197.50 (19% x $185,250); and his shares in Saanil were valued at $10,260 (19% x $54,000).

14.  Mr. Rao filed for personal bankruptcy in October 2010.  His bankruptcy petition reflects a monthly net income of $1,447.67, but average monthly expenses of $2,773.  (Pl.'s Trial Ex. P-BBB at Schedules I and J.)  The Summary of Schedules indicate that Mr. Rao had total assets of approximately $729,000 and liabilities exceeding $4 million.  (*Id*. at Summary of Schedules.)

15.  The corporate records of Rao reflect that on October 10, 2008, the Board of Directors met and passed a resolution that Mr. Rao "forfeit back to the company (Rao's Hospitality Inc.) his nineteen percent (19%) ownership; his rights to all stock options and profits."  (Pl.'s Trial Ex. P-H.)  Rao also passed a resolution that Mr. Rao was "terminated from; and . . . relinquished of all authority; in the positions he held as Secretary and Treasurer, for Rao's . . . ."  (*Id*.)  Mrs. Rao signed the "Corporate Resolution" on behalf of Rao in her capacity as its President.  (*Id*.)

16.  The corporate records of Saanil reflect that on August 6, 2008, the Board of Directors met and passed a resolution that Mr. Rao "forfeit back to Saanil Hospitality Inc. his nineteen percent (19%) of corporate stock."  (Pl.'s Trial Ex. P-O.)  Saanil also passed a resolution that Mr. Rao was "terminated from his position of Vice President . . . [and] [i]mmediately upon this notification, [Mr. Rao] will relinquish all of his responsibilities relating to the position . . . ."  (*Id*.)  Mrs. Rao signed the "Member Action" on behalf of the corporation in her capacity as its President.  (*Id*.)

17.  The corporate records of Pooja reflect that on February 12, 2009, the Board of Directors met and passed a resolution that Mr. Rao "forfeit back to the company (Pooja Hospitality Inc.) his share of ownership; his rights to all stock options and profits."  (Pl.'s Trial Ex. P-S.)  Pooja also passed a resolution that Mr. Rao was "terminated from; and . . . relinquished of all authority; in the positions he held for Pooja . . . ."  (*Id*.)  Mrs. Rao signed the "Corporate Resolution" on behalf of the corporation in her capacity as its President.  (*Id*.)

18. On a Schedule B form that Mr. Rao filed in connection with his bankruptcy case, he represented that he was an owner of G&H until July 1, 2008; an owner of Pooja until February 2, 2009; an owner of Rao's until October 10, 2008; and an owner of Saanil until August 6, 2008. (Tr. 56–58; Pl.'s Trial Ex. P-CCC.)

19. Mrs. Rao testified that Saanil, Rao, and Pooja did not give anything to these companies in exchange for Mr. Rao's forfeiture of stock. (Tr. at 70–73.)

20. Mrs. Rao has an accounting degree and a MBA from a university in India and has been personally involved in the purchase and sale of other hotel properties. She testified that hotel businesses and properties are valued based upon their gross revenue, with a multiplier between three and four. The gross revenue for Pooja from its hotel was $359,000 in 2006, $328,859 in 2007, $320,805 in 2008, and $293,390 in 2009. Pooja paid $1.3 million for the hotel in 2002. The Champaign County Auditor lists the value of the hotel property at $1.36 million. Pooja's hotel was encumbered by a $1.3 million loan in mortgage in 2002 and a $1.8 million loan and mortgage in 2005. Mrs. Rao opined that in 2008, the only asset of Pooja, the hotel, had negative value.

### III.    ANALYSIS & CONCLUSIONS OF LAW

As set forth above, McLane asserts that Mr. Rao's forfeitures of his shares of stock in Saanil, Pooja, and Rao were fraudulent under Ohio Revised Code § 1336.05(A). The Court agrees. Ohio Revised Code § 1336.05(A) provides as follows:

> A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Ohio Rev. Code § 1336.05(A). Thus, to establish that Mr. Rao's transfers of his shares of stock

10

were fraudulent under § 1336.05(A), McLane must demonstrate that: (1) Mr. Rao transferred his shares of stock after July 1, 2008, when G&H and Mr. Rao incurred their obligation to pay McLane for the products it supplied; (2) Mr. Rao did not receive reasonably equivalent value in exchange for transferring his shares of stock; and (3) Mr. Rao was insolvent at that time or became insolvent as a result of the transfers.  The Court addresses each of these elements in turn.

## A.        Timing of the Transfers

McLane has demonstrated that Mr. Rao forfeited his shares of stock in Saanil, Pooja, and Rao after July 1, 2008, when G&H and Mr. Rao incurred their obligation to McLane.  As set forth above, the respective companies' shares certificates all state that their shares are "transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed."  (Pl.'s Trial Exs. P-P, P-J, and P-D.)  Pooja's  Code of Regulations and Saanil and Rao's Bylaws likewise require transfers of stock to be entered on the books of the respective corporations.  Saanil's corporate records reflect that on August 6, 2008, Mr. Rao "forfeit[ed] back to Saanil" his shares of stock.  (Pl.'s Trial Ex. P-O.)  Likewise, Rao's corporate records reflect that Mr. Rao "forfeit[ed] back to the company" his shares of stock on October 10, 2008.  (Pl.'s Trial Ex. P-H.)  Finally, Pooja's corporate records reflect that on February 12, 2009, Mr. Rao "forfeit[ed] back to the company" his shares of stock.  (Pl.'s Trial Ex. P-S.)  Consistently, Mr. Rao, in his bankruptcy case, represented, under oath, that he held ownership in Saanil, Rao, and Pooja until August 6, 2008, October 10, 2008, and February 2, 2009, respectively.  (Pl.'s Trial Ex. P-CCC.)  The Court concludes that these forfeiture dates are the operative transfer dates for the purposes of assessing whether Mr. Rao's transfers of his shares of stock were fraudulent under Ohio Revised Code § 1336.05(A).

In reaching this conclusion, the Court acknowledges that if the evidence demonstrated that Mrs. Rao had personally loaned Mr. Rao $550,000 as Defendants allege, the operative transfer date for the purposes of assessing whether Mr. Rao's transfers of his shares of stock were fraudulent under Ohio Revised Code § 1336.05(A) would be September 1, 2007. As Defendants point out, under Ohio's UFTA, a transfer is made upon perfection of a security interest and consistently, property encumbered by a valid lien, such as a perfected security interest, is not an "asset" as that term is defined under Ohio's UFTA. *See* Ohio Rev. Code § 1336.01(B)(1) (defining "asset" as "property of a debtor," but excluding from the definition "[p]roperty to the extent it is encumbered by a valid lien"); Ohio Rev. Code § 1336.01(B)(1) ("'Lien' . . . includes a security interest created by agreement . . . ."); Ohio Rev. Code § 1336.01(M) ("'Valid lien' means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."); Ohio Rev. Code § 1336.06(A)(1)(b) ("A transfer is made if . . . the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under this chapter that is superior to the interest of the transferee."); *Comer v. Calim*, 128 Ohio App.3d 599, 605 (Ohio App. 1 Dist. 1998) (citing Ohio Rev. Code § 1336.06(A)(2)(b)) ("[W]hen applicable law does permit the transfer to be perfected, the transfer is not made until the security interest is perfected."). To perfect her security interest in Mr. Rao's shares of stock such that she acquired her interest "free of any adverse claim," Mrs. Rao had to "*give*[] *value*; . . . not have notice of any adverse claim to the security; and . . . [o]btain[] control of the . . . security." *See* Ohio Rev. Code § 1308.17 (emphasis added). "[A] person gives value for rights if the person acquires them . . . [a]s security for, or in total or partial satisfaction of, a preexisting claim." Ohio Rev. Code § 1301.204(B). In this case, the evidence demonstrates that in September 2007, Mrs. Rao obtained

control of Mr. Rao's securities and did not have notice of any adverse claim. The issue, then, is whether Mrs. Rao gave value, *i.e.*, whether she acquired the rights to Mr. Rao's shares of stock as security for "a preexisting claim." *See* Ohio Rev. Code § 1301.204 ("[A] person gives value for rights if the person acquires them . . . [a]s security for . . . a preexisting claim.") According to Defendants, the "preexisting debt" is the $550,000 Mr. Rao owed to Mrs. Rao on a loan she personally gave to him so that he could purchase twenty-six KFC restaurants. (Defs.' Post-Trial Br. 13, ECF No. 72.) Defendants maintain that the December 29, 2005 Cognovit Note memorializes this loan.

The evidence, however, does not support Defendants' assertion that Mrs. Rao acquired her security interest in Mr. Rao's shares of stock in exchange for an extension of time to repay a valid antecedent debt. Rather, the evidence demonstrates that no valid antecedent debt existed because Mrs. Rao did not personally loan Mr. Rao any funds. Consistent with Mr. Rao's testimony that Pooja gave G&H the money to buy the KFCs, the loan documents demonstrate that the $516,196.79 G&H utilized as a down payment for purchasing the KFCs came from a refinance of a prior loan between Pooja and Commercial Savings Bank. As set forth above, Mrs. Rao was not a borrower on this loan, and she was not personally obligated to make any payments. Instead, Mr. Rao utilized his ownership interest to obtain the cash-out refinance loan, representing to the bank that he was the President and majority shareholder. (Pl.'s Trial Exs. P-W and P-AA.) Consistently, Mr. Rao was listed as a borrower, was personally obligated to make payments on the loan, and pledged property in which Mrs. Rao had no interest in as collateral for the loan. Mrs. Rao's testimony that Mr. Rao was not obligated to pay Commercial Savings Bank *and* her $550,000 further supports the Court's conclusion that she did not personally loan him $550,000 to purchase the KFC restaurants.

The Court rejects Defendants' alternative argument that the value Mrs. Rao provided was her consent to refinance Pooja's loan with Commercial Savings Bank. As set forth above, the evidence presented at trial establishes that Mr. Rao, as President and an owner of Pooja, obtained the refinance loan; there is no evidence that the bank required Mrs. Rao's consent. Defendants assert that "[*b*]*efore* acquiescing to Pooja's securing a new loan with Commercial Savings Bank and further encumbering the hotel business and property, [Mrs. Rao] asked [Mr. Rao] to provide her with a promissory note in the amount of five hundred fifty thousand dollars ($550,000)." (Defs.' Post-Trial Br. 8 and 17, ECF No. 72 (emphasis added).) The Cognovit Note, however, was dated December 29, 2005, nearly six weeks after the November 11, 2005 closing on the refinance loan with Commercial Savings Bank. Thus, Mrs. Rao's alleged consent to refinance Pooja could not serve as consideration for the Cognovit Note, which Mr. Rao executed weeks after, or the subsequent Security Agreement because "past consideration is no consideration at all." *Prendergast v. Snoeberger*, 154 Ohio App.3d 162, 169 (Ohio App. 7 Dist. 2003) (internal quotation marks and citation omitted). Finally, Mrs. Rao's testimony belies Defendants' alternative argument that the value Mrs. Rao provided was her consent to refinance Pooja's loan with Commercial Savings Bank. According to this position, in addition to his obligation to Commercial Savings Bank, Mr. Rao would also be obligated to pay Mrs. Rao $550,000 pursuant to the Cognovit Note, which he executed in exchange for obtaining her consent. Mrs. Rao testified, however, that Mr. Rao was *not* obligated to pay Commercial Savings Bank *and* pay her $550,000. (*See* Tr. at 133–34.) She further testified that she had Mr. Rao provide the Cognovit Note to her "to make sure" that he repaid Pooja's loan, something that he was already required to do, not as an exchange for her consent or any duty that he owed to her. (*See id*.) Thus, the evidence does not support Defendants' alternative

argument that her consent was the value she gave in exchange for the Cognovit Note and the subsequent Security Agreement.

In sum, the Court rejects Defendants' assertion that Mr. Rao transferred his shares of stock in September 2007 and concludes instead that, for purposes of Ohio Revised Code § 1336.05(A), McLane has demonstrated that Mr. Rao transferred his shares of stock after July 1, 2008, when G&H and Mr. Rao incurred their obligation to pay McLane for the products it supplied.

**B.      Reasonably Equivalent Value**

There is no evidence that Mr. Rao received any value in exchange for forfeiting his shares of stock back to Saanil, Rao, and Pooja. Indeed, Mrs. Rao testified that Saanil, Rao, and Pooja did not give anything to Mr. Rao in exchange for his forfeiture of stock. (*See* Tr. at 70–73.) Accordingly, the Court concludes that McLane has established the second element of its fraudulent transfer claim under Ohio Revised Code § 1336.05(A).

**C.      Insolvency**

McLane has established that Mr. Rao was insolvent when he forfeited his shares in Rao, Saanil, and Pooja. "[A] debtor is insolvent if the sum of the debts of the debtor is greater than all of the assets of the debtor at fair valuation." Ohio Rev. Code § 1336.02(A)(1). In addition, "[a] debtor who generally is not paying his debts as they become due is presumed to be insolvent." Ohio Rev. Code § 1336.02(A)(2). "'Insolvency is not always susceptible to direct proof and frequently must be determined by proof of other facts or factors from which the ultimate fact of insolvency on the transfer dates must be inferred or presumed.'" *In re Stanley*, 384 B.R. 788, 807 (Bankr. S.D. Ohio 2008) (quoting *Dahar v. Jackson*, 318 B.R. 5, 16 (Bankr. D.N.H. 2004)).

The evidence indicates that Mr. Rao was insolvent from July 2008 until he filed for

bankruptcy in October 2010. Mr. Rao admitted that he did not have sufficient funds to pay McLane in July 2008 for the supplies it provided to G&H during the period of June 12, 2008, through July 1, 2008. In August 2008, Mr. Rao's net worth was negative $1.5 million or greater. He filed for bankruptcy in October 2010, with assets of approximately $729,000 and liabilities exceeding $4 million. Based upon the foregoing, the Court concludes that an inference of insolvency on August 6, 2008, October 10, 2008, and February 2, 2009, when he forfeited his share shares in Saanil, Rao, and Pooja, is appropriate.

**D.      Calculation of Judgment**

Ohio's UFTA permits a creditor demonstrating that a transfer was fraudulent under § 1336.05 to avoid the transfer to the extent necessary to satisfy the creditor's claim. Ohio Rev. Code § 1336.07(A)(1). It further permits the creditor to "recover a judgment for the value of the asset transferred, as adjusted under division (B)(2) of this section, or the amount necessary to satisfy the claim of the creditor or agency, whichever is less." Ohio Rev. Code § 1336.08(B)(1). Division (B)(2) provides that "[i]f the judgment under division (B)(1) of this section is based upon the value of the asset transferred, the judgment shall be in an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require." Ohio Rev. Code § 1336.08(B)(2). "The judgment may be entered against . . . [t]he first transferee of the asset . . . ." Ohio Rev. Code § 1336.08(B)(1)(a). Thus, Ohio courts have held that a creditor may bring suit against the original transferee for the value of the transferred property. *See Brown Bark II, L.P. v. Coakley*, 188 Ohio App.3d 179, 186 (Ohio App. 10 Dist. 2010) (citations omitted) (noting that Ohio courts have held that Ohio's UFTA "provides for remedies and judgments against the transferee of the property, making the transferee a necessary and proper party").

In this case, Mr. Rao forfeited his shares of stock to Pooja, Saanil, and Rao. These companies are, therefore, the original transferees. Because Rao is no longer a Defendant, McLane seeks judgment against Pooja and Saanil. McLane also seeks judgment against Mrs. Rao, asserting that she is a "de facto transferee" of the shares and should be held "jointly and severally liable on the full amount." (Pl.'s Post-Trial Br. 16, ECF No. 71.) McLane also seeks to recover its attorneys' fees incurred in pursuing this action. The Court first considers the value of the shares forfeited before turning to whether Mrs. Rao, a shareholder, can be held jointly and severally liable as a "de facto transferee" and whether the Court can award attorneys' fees.

### 1. Value of the Forfeited Shares of Stock

McLane is entitled to judgment in the amount of the value of forfeited shares, measured at the time of the forfeiture. The Court must, therefore, determine the value of Mr. Rao's shares of Pooja stock as of February 2, 2009, and of his shares of Saanil stock as of August 6, 2008.[1]

McLane maintains that Mr. Rao's shares of stock in Pooja and Saanil should be valued at the amounts that Mr. Rao represented the shares were worth as of August 2008 in his personal financial statement, which Mr. Rao submitted to McLane in October 2008. In that document, under "Assets," Mr. Rao listed Pooja's value at $488,014 and Saanil's value at $54,000, noting the percentage of his ownership next to the valuations.[2] (Pl.'s Trial Ex. P-B.)

---

[1] Rao is no longer a Defendant. Because the Court concludes that Mrs. Rao is not jointly and severally liable (*see infra* Section III.D.2), it is unnecessary for the Court to determine the value of Mr. Rao's shares of Rao stock as of the forfeiture date.

[2] McLane's contention that Mrs. Rao's acceptance of these shares in cancellation of his purported $550,000 debt to her is evidence that "these shares were collectively worth at least $550,000" is unpersuasive. (Pl.'s Post-Trial Br. 20, ECF No. 71.) First, Mrs. Rao agreed to accept the shares of stock as collateral in September 2007, not at the time of transfer. Second, as McLane has pointed out, these shares of stock were Mr. Rao's "only valuable assets." (*Id*. at 1.)

As noted in the Court's findings of fact, however, in drafting the personal financial statement, Mr. Rao failed to take into account the additional $500,000 in liabilities Pooja incurred from the cash-out refinance loan. Thus, Pooja, encumbered by a $1.8 loan at the time of transfer, had no monetary value. The Court's conclusion that Pooja's shares lacked monetary value in February 2009 because of the $1.8 million encumbrance is consistent with the county auditor's valuation of Pooja's hotel property at $1.36 million and also Mrs. Rao's testimony. Specifically, Mrs. Rao testified that Pooja had negative value, explaining that hotel businesses and properties are valued based upon their gross revenue, with a multiplier between three and four. Applying a multiplier of four to Pooja's gross revenue in 2008, Pooja's estimated value would be $1.3 million. Applying that same multiplier in 2009, the value would be less than $1.2 million. Because the forfeited Pooja shares had no value, McLane is not entitled to a judgment against Pooja.

Multiplying Mr. Rao's August 2008 valuation of Saanil by his nineteen percent ownership equals $10,260. The Court concludes that McLane is entitled to recover this amount from Saanil.

## 2.      Personal Liability of Mrs. Rao

McClane asserts that Mrs. Rao should be held jointly and severally liable as the "defacto transferee" of the shares of Pooja, Rao, and Saanil stock. (Pl.'s Post-Trial Br. 16, 22, ECF No. 71; Reply 10, ECF No. 73). It appears that McClane makes this argument because Mr. Rao's forfeiture of his shares in these companies left Mrs. Rao as the sole shareholder. Mrs. Rao's status as a sole shareholder, however, does not permit the Court to hold her personally liable for the value of the forfeited shares.

"The principle that shareholders, officers, and directors of a corporation are generally not liable for the debts of the corporation is ingrained in Ohio law." *Dombroski v. WellPoint, Inc.*, 119

Ohio St.3d 506, 510 (2008). Shareholders, however, "are not absolutely immune from liability."

*Id*. "Piercing the corporate veil [to hold shareholders liable] remains a rare exception to be applied

only in the case of fraud or certain other exceptional circumstances." *Id*. (internal quotation marks

and citation omitted). In *Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio

St.3d 274 (1993), the Supreme Court of Ohio set forth the following three-pronged test for courts to

utilize when deciding whether a shareholder should be held liable for the acts of a corporation:

> The corporate form may be disregarded and individual shareholders held liable for
> wrongs committed by the corporation when (1) control over the corporation by those
> to be held liable was so complete that the corporation has no separate mind, will, or
> existence of its own, (2) control over the corporation by those to be held liable was
> exercised in such a manner as to commit fraud or an illegal act against the person
> seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the
> plaintiff from such control and wrong.

67 Ohio St.3d at 288–89. The Supreme Court of Ohio subsequently modified the second prong of

the test articulated in *Belvedere*, requiring a plaintiff seeking to hold a shareholder liable to

"demonstrate that the defendant shareholder exercised control over the corporation in such a manner

as to commit fraud, an illegal act, or a similarly unlawful act." *Dombroski*, 119 Ohio St.3d at 513.

Here, Mrs. Rao cannot be held personally liable because McClane has failed to demonstrate

the first prong of the *Belvedere* test. In order to satisfy *Belvedere's* first prong, McClane must

establish that Mrs. Rao is "fundamentally indistinguishable" from the corporations. *Belvedere*, 67

Ohio St.3d 288; *RCO Int'l Corp. v. Clevenger*, 180 Ohio App. 3d 211, 214 (10th Dist. 2008) (citing

*Univ. Circle Research Ctr. Corp. v. Galbreath Co*., 106 Ohio App.3d 835, 840 (1995)) ("The party

seeking to have the corporate form disregarded bears the burden of proof."). Rather than argue that

Mrs. Rao and her corporations were indistinguishable, McClane instead asserts that the

corporations, specifically Pooja, made the decision independently of her to refinance and loan

money to G&H.  (Pl's. Post-Trial Br. 17-18, ECF No. 71.)  McClane distinguishes Mrs. Rao from

the corporations in which she held shares, emphasizing that the loan to G&H did not come from her

personally and that the shares of Pooja, Rao's, and Saanil were not transferred to her in connection

with the Security Agreement but instead forfeited to their respective companies without

consideration.[3]  (*Id.* at 17–21.)  For these reasons, the Court concludes that McClane has not met its

burden to establish that Mrs. Rao's control of Saanil, Rao, and Pooja was so complete that they

lacked an existence separate from hers.  Because McClane failed to satisfy the first prong of the

*Belvedere* test, the corporate form remains intact, protecting the shareholder, Mrs. Rao, from

personal liability from a judgment against her corporations.  The Court, therefore, does no consider

the remaining factors.

### 3.    Attorneys' Fees

McLane asserts that it "is entitled to recover its attorneys's fees incurred in pursuing this

action . . . ."  (*Id.* at 21.)  In support of this assertion, McLane relies upon *Locafrance United States*

*Corp. v. Interstate Distrib. Services, Inc.*, 6 Ohio St.3d 198 (1983), and *Lesick v. MedGroup Mgmt,*

*Inc.*, No. 990097, 1999 WL 979136 (Ohio App. 1 Dist. Oct. 29, 1999).  McLane's reliance upon

*Locafrance* and *Lesick* is misplaced.  In *Locafrance*, the Ohio Supreme Court found that the

transferor's actions "were willful, intentional and deliberate as required . . . for an award of punitive

---

[3]McLane makes these arguments in support of its assertion that Mrs. Rao did not give
value in exchange for acquiring her security interest in Mr. Rao's shares of stock.  Because the
Court agreed with McLane that Mrs. Rao did not give value, the Court concluded that Mrs.
Rao's security interest in Mr. Rao's shares of stock was not perfected and, consequently, no
transfer was made upon execution of the Security Agreement in September 2007.  If, however,
the Court were to conclude that Mrs. Rao, as the alter ego of Pooja, *is* personally liable for
Pooja's debts, then the Court would be compelled to conclude that Mrs. Rao gave value in
exchange for acquiring her security interest given that she would be personally liable for Pooja's
cash-out refinance loan.

damages." 6 Ohio St.3d at 202. Based upon this finding, the *Locafrance* Court then concluded that the trial court also properly awarded attorneys' fees, explaining that it had previously held that "'[i]f punitive damages are proper, the aggrieved party may also recover reasonable attorney fees.'" *Id.* at 202–03 (quoting *Columbus Finance v. Howard*, 42 Ohio St.2d 178, 183 (1975)). Relying on *Locafrance*, the *Lesnick* court noted that "the court may order the party that committed the fraudulent transfer to pay attorney fees and punitive damages." 1999 WL 979136, at *5. In this case, the transferor, Mr. Rao, is no longer a defendant. The cases McLane relies upon do not vest this Court with authority to order transferees to pay attorneys' fees. Accordingly, McLane's request for attorneys' fees is denied.

## IV. DISPOSITION

The Clerk is **DIRECTED** to enter **JUDGMENT** in favor of McClane Food Service, Inc. and against Saanil Hospitality, Inc. in the amount of $10,260. The Clerk is further **DIRECTED** to remove this case from the Court's pending cases list.

**IT IS SO ORDERED**.

Date: June 8, 2012                    _____/s/ *Elizabeth A. Preston Deavers*_____
                                                      Elizabeth A. Preston Deavers
                                                      United States Magistrate Judge